SECOND DIVISION

March 14, 2000

No.  1-98-0965

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

)

)

MICHAEL RUIZ, ) Honorable

) Daniel Locallo

Defendant-Appellant. ) Judge Presiding.

)

JUSTICE GORDON delivered the opinion of the court:

The defendant, Michael Ruiz, was charged with and convicted of one count of armed robbery (720 ILCS 5/18-2(a) (West 1994)), two counts of attempted murder of a police officer (720 ILCS 5/8-

4 (West 1994), 720 5/9-1(b)(1) (West 1994)) and two counts of attempted murder (720 ILCS 5/8-4 (West 1994), 720 ILCS 5/9-1 (West 1994)).  The defendant received a sentence of 20 years for armed robbery, 30 years on each of the two attempted murder counts, and 55 years for each count of attempted murder of a police officer.  Some of the sentences were to be served consecutively, and some concurrently, resulting in a total of 105 years in prison.

On appeal, the defendant argues that one of his convictions for attempted murder of a police officer must be reversed because the evidence did not establish that he knew or should have known that the victim was a police officer.  Defendant further contends that the statute providing the sentencing range for his convictions of attempted murder of a police officer is void, because Public Act 88-680 violates the single subject rule of the Illinois Constitution, and therefore he must be re-sentenced on those counts.  Defendant also argues that the court abused its discretion in sentencing him to 30 years on each count of attempted murder.  Finally, defendant argues that the trial court erred in its determination of which sentences were to be served consecutively and which were to be served concurrently in sentencing him to a total of 105 years in prison.  For the reasons stated below, we affirm the conviction for the attempted murder of James Anhalt as a police officer, reverse the sentences for the attempted murder of Anhalt as a police officer and Roy Whitmore as a police officer, affirm the sentences for the attempted murder of Anhalt as a civilian and Christopher Oliva as a civilian, and reverse the determination of which sentences were to be served consecutively.

The defendant was convicted on February 9, 1998, of armed robbery, attempted murder and attempted murder of a police officer.
(footnote: 1)  The charges grew out of the defendant's robbery of the LaSalle Cragin bank, the ensuing shoot-out with police, and the defendant's flight from police.  The defendant was tried before a jury, and was represented by counsel.

At trial Robert Pennington testified for the State that on September 1
, 1998, he was a messenger employed by Brinks Incorporated.  Around 2:23 p.m. he arrived at the LaSalle Cragin Bank located at the corner of Montrose and Austin in Chicago.  He was riding in the back of the Brinks truck, and was prepared to deliver $140,000 in cash to the bank.  Pennington's partner backed the truck up to the bank, and Pennington exited the rear of the truck, placed the bag of currency on a hand truck, and proceeded towards the door, where he was met by a bank security guard.  As he got through the door, he heard a commotion inside, turned around, and saw a man wearing sunglasses, a bandana and a dark blue baseball cap pointing a gun at his head.  The man announced that this was a robbery, grabbed the cash bag and pushed Pennington over the hand truck.  A short while later, the security guard returned with the money.  On cross examination it was established that Pennington did not observe the robber outside the bank after he fled, and did not hear any gunshots.

The state next called Jesus Castoza who testified that he was working as a bank security officer at the LaSalle Bank at 6000 West Montrose on September 1
, 1995.  Castoza testified that around 2:20 p.m. he was waiting by the door for an armored truck to deliver a bag of money.  As Pennington was coming in the door, a man in a ski mask and sunglasses put a gun to Pennington's head and said "give me the goddamn money," before grabbing the money bag and running out the door into the alley.  Castoza ran after him, and saw a police car pulling into the parking lot.  The man did not drop his gun or the money, and a uniformed police officer announced his office and began to chase him, with Castoza following.  The man began to shoot, and the police officer returned fire.  The man then dropped the money and jumped into a red car which drove away.  Castoza returned the money to the bank.

The State next called James Anhalt, who testified that he is a detective with the Chicago Police Department and that on September 1
, 1995, at about 2:20 p.m., he was off duty and was not wearing any police identification.  Anhalt was in the drive-

through lane at the LaSalle Bank at Montrose and Austin when he observed a man crouched in front of him who was dressed in black and holding a revolver.  The man headed toward the front door of the bank, and Anhalt observed people in the bank yelling and moving fast.  Anhalt then averred that he saw a marked police car on Montrose with one uniformed officer inside (whom he later learned to be Roy Whitmore) who appeared to be calling in the robbery.  

Anhalt exited his car, and heard a gunshot from the front of the bank a few seconds later.  He turned around, and saw the man in black running westbound through the alley behind the bank with a bag of money.  Anhalt ran westbound on Montrose parallel to the man in the alley, and heard four or more gunshots as he ran.  When he reached the corner, Anhalt saw a red sports car backing up towards him on McVickers, and the man in black running southbound towards him with a gun.  Anhalt ran to a parked van for cover, pulled his gun, and yelled "stop, police" at the suspect.  Before he got the word "police" out, the man in black began to shoot, and Anhalt was hit by the first or second of numerous shots fired.

Anhalt declared that the bullet entered the upper right hand side of his arm, and exited by his shoulder blade in back.  There are still several pieces of it lodged in his shoulder.  The bullet just missed his heart and lungs, and he had to take 5 months off work to recover.

The State then called Roy Whitmore who testified that he is a Chicago Police Officer who was traveling eastbound on Montrose at around 2:20 on the afternoon in question
.  Officer Whitmore was in full uniform, and was driving a marked squad car.  As he approached Austin Avenue, he noticed a person (later identified as the defendant, Ruiz) crouched by a pole in the parking lot of the LaSalle Cragin Bank.  The defendant was wearing dark clothing, what appeared to be a bulletproof vest, and had a weapon in his hand.  As Whitmore slowed down to observe, the defendant ran to the bank door, put a mask over his face, and entered the bank.  Whitmore radioed for backup, and pulled his car into the bank parking lot, with a parked car between him and the bank.  

Whitmore declared that before he could exit his squad car the defendant burst out of the bank with a money bag, saw him, and pointed his weapon directly at his (Whitmore's) head.  Whitmore crouched down low in his car, and fired a warning shot into the air.  The defendant ran towards the alley, and Whitmore gave pursuit while yelling "stop police."  When the defendant reached the alley he jumped over the guardrail and ran westbound down the alley, with Officer Whitmore following.  Whitmore heard three or four shots, but could not determine their origin.  Whitmore continued to pursue the defendant, and heard numerous other shots.  Whitmore yelled "stop, police" at the defendant, who turned towards him with the gun.  Whitmore fired one shot, which hit the defendant, who then jumped into a red car which was waiting for him.  The car drove off, with the defendant shooting out the window at Whitmore, who returned fire.

Whitmore averred that during the course of the shooting he felt a sharp pain to the inside of his left knee.  He later determined that a bullet had struck him; however, he did not seek medical treatment until after he had attended a police roundtable meeting.  After the suspect had driven off in the car, Whitmore saw a man in civilian clothes who had been shot.  Whitmore did not know this man was a police officer until he identified himself as Detective Anhalt.  Whitmore later identified the defendant, Ruiz, as the man who robbed the bank.  He further declared that Ruiz never surrendered to him, nor did he ever drop his weapon.

Marni Morizzo testified for the State that on the evening in question at around 2:30 in the afternoon, she was walking her dog southbound on Neenah in the vicinity of Higgins.  She averred that she saw a red sports car crash head on into a dark, older car.  The passenger in the red car leaned out of the car, pointed a large, long barreled gun at the driver of the dark car and fired two shots. 

The State then called Christopher Oliva, who testified that he was formerly a building laborer, and that on the evening in question at around 2:30 p.m. he was driving south on Neenah in his 1989 Chevy Caprice, which he averred to be in excellent condition.  After he stopped at a stop sign, a red car came speeding around the corner with two people in it and smashed into his car.  The passenger of the car pulled out a shotgun, aimed it directly at Oliva's face and fired twice, from about 8 to 10 feet away.  Oliva ducked, floored his vehicle, and crashed into a building.  He identified the shooter as the defendant in court.  He declared that he was transported to a hospital and that as a result of this incident now has two herniated cervical disks which remain injured.  His injuries are permanent.

Assistant State's Attorney Sharon Opryszek testified for the State that on September 2, 1995, she interviewed the defendant at the hospital, where he gave a statement.  Opryszek averred that in his statement defendant admitted to planning and executing the robbery of the bank.  Defendant admitted shooting at someone in a uniform that looked like a police uniform, but stated that he shot low.  He also stated that he was shot by a man in a white shirt, who yelled "freeze."  He admitted shooting at the man in the white shirt before getting into a car driven by his brother, and shooting out of the window as they drove away.

Michael Ruiz testified in his own defense that he attended Clemente High School through his freshman year, after which he went to work as a laborer for three years.  He then completed a G.E.D., and enrolled in the Job Corps for over a year where he studied plumbing.  After finishing Job Corps he found a position with a plumbing company as a laborer and he worked there for five years until 1992, when he was laid off.  Ruiz then went into the security field, completing a 40-hour training course and worked for a security company until later becoming unemployed.

On the morning of September 1, 1995, the defendant went to his brother's house and he and his brother discussed their plans for the robbery of an armored truck.  Ruiz had been following armored trucks for four months in preparation.  He brought a bag to his brother's house which contained, among other things, two rifles, a bulletproof vest and two handguns.  He put different license plates on his brother's car.  Eventually, they decided to rob a Brinks armored truck that would arrive at its Montrose and Austin stop at around 2:30 in the afternoon.  His brother parked the car near the bank, and Ruiz began to walk toward the bank wearing the bulletproof vest with a blue shirt and a black vest over it, when he saw the armored truck messenger come out of the truck with a bag of money. 

Twenty seconds or so after the armored truck messenger entered the bank, Ruiz followed him in, wearing gloves and sunglasses, and with a .9 millimeter handgun tucked into his waistband.  He slipped his ski mask on as he entered the door.  Ruiz displayed his weapon, but averred that he never put it to anyone's head.  Ruiz testified that he knew that the guard would not resist, because he worked for Kane Security, the same company Ruiz had worked for, and Ruiz knew the rules and regulations.  He picked up the money and walked out of the bank.  Ruiz ran towards the alley behind the bank.  As he reached a guardrail blocking his path he felt himself being shot, dropped the money, and his handgun fell off his waist.  He heard five or six shots, and turned around to see a person who looked like a Chicago police officer pointing a gun at him.  Ruiz averred that when he put his hands up and tried to surrender, the officer shot at him again, but his gun did not go off.  The officer then reloaded his gun, and Ruiz picked up his gun and ran through the alley until he reached McVickers.

Ruiz declared that he saw his brother's car at the corner of Montrose and McVickers, but his brother did not see him.  Ruiz fired three shots into the air to get his attention.  As he walked towards the car, the uniformed officer fired three shots at him.  Ruiz testified that as he tried to get to the car, he fired two shots at the floor.  Once he got to the corner and was almost to the car, a man in business clothes started shooting at him.  Ruiz averred that he did not hear this man say anything.  Ruiz returned fire, and as he got into the car the uniformed officer continued firing at him.  Ruiz stated that he was not trying to kill the man in civilian clothes.  Ruiz also stated that once he got into the car he said to his brother, "these cops, they're trying to kill me."

Ruiz and his brother sped away from the accident, with his brother driving.  After turning a corner they hit a Caprice head-

on.  Ruiz testified that the car looked like a detective car, that the man inside looked like a detective because of his vest and shades, and that the occupant appeared to be reaching for a gun.  Ruiz averred that he then took a shotgun and fired a warning shot at the other car, not intending to kill the occupant.  Ruiz was taken to the hospital, and declared that when he gave the statement to the assistant State's Attorney he thought she was his attorney.

The defendant was convicted of two counts of attempted murder, two counts of attempted murder of a police officer, and one count of armed robbery.  At the sentencing hearing the court found that the jury had basis to find Ruiz guilty of attempted murder of Anhalt as a civilian for the initial shot which hit Anhalt, and also to find Ruiz guilty of the attempted murder of Anhalt as a police officer for the shots that were fired after Anhalt announced his office.  The court stated that the triggering offense was the armed robbery, which combined with severe bodily injury required consecutive sentences.  The court ruled that Mr. Oliva was not injured as a result of the attempted murder because his injuries were caused by the automobile collision, and not by the shots fired.  The court also ruled that the injury to Officer Whitmore's knee and the injury to Anhalt's shoulder were both severe bodily injuries.  The court imposed two 55-year sentences for the attempted murders of Anhalt and Whitmore as police officers, which were to be served concurrently to each other and concurrently to the 30-year sentence for the attempted murder of Oliva.  These three sentences were to be served consecutively to the 30-year sentence for the attempted murder of Anhalt as a civilian, and the 20-year sentence for armed robbery.  The total sentence was 105 years.  This appeal followed.   

On appeal the defendant first argues that his conviction for the attempted murder of Anhalt as a police officer must be reversed because the State did not prove that he knew that Anhalt was a police officer.  In support the defendant points out that Anhalt testified that by the time he announced his office, the defendant had already shot him.  The State contends that evidence showing that defendant encountered a marked squad car and a uniformed officer before shooting Anhalt, and evidence that the defendant continued shooting after Anhalt announced his office is sufficient to prove beyond a reasonable doubt that he knew or should have known that Anhalt was a police officer.  For the reasons discussed below, we agree with the State.

Section 5/8-4 of the Criminal Code of 1961 provides that an attempt is committed when a person "does any act which constitutes a substantial step" towards the commission of an offense.  720 ILCS 5/8-1(a) (West 1995).  In section 5/9-1 the code defines homicide and states that it is an aggravating factor
(footnote: 2) if "the defendant knew or should have known that the murdered individual was a peace officer."  720 ILCS 5/9-1 (b)(1) (West 1995).  "'Knowledge' is not the same as 'should have known.'  'Knowledge' involves conscious awareness [citation] while 'should have known' implicates 'the standard of care which a reasonable person would exercise' and therefore pertains to the lesser mental states of 'recklessness' and 'negligence' [citation]." 
People v. Nash
, 282 Ill. App. 3d 982, 986, 669 N.E.2d 353, 356 (1996).  

We believe that 
People v. Pasch
, 152 Ill. 2d 133, 604 N.E.2d 294 (1992), is directly on point.  In 
Pasch
 the defendant was convicted of murdering a plain clothes police officer.  The defendant shot his landlord in his yard, and then took a woman hostage inside an apartment.  He then shot the officer (who arrived in an unmarked car and never announced his office) from inside the apartment.  The evidence showed that the defendant turned his head in the direction from which police sirens were coming before he ran inside the apartment, and that at least one squad car pulled up near the building he was in.  The defendant told a police officer that he had shot two people, one of whom was a cop.  The court noted that "[l]ogic also dictates that defendant knew or should have known that the police were informed of" the first shooting and "that it would just be a matter of minutes" before their arrival.  
Pasch
, 152 Ill. 2d at 215.  The court held that the evidence showed beyond a reasonable doubt that the defendant knew or should have known the decedent was a police officer.

In the case at bar, the evidence has shown that as the defendant ran out of the bank, there was a marked squad car in the parking lot from which Officer Whitmore fired a shot at defendant.  Whitmore, who was in uniform, then pursued the defendant through an alley.  While Anhalt testified that he did not yell "police" until after the defendant had shot him, the defendant continued to shoot at him after he announced his office.  The defendant testified that after the chase he told his brother that "these cops, they're trying to kill me" indicating that he knew that more than one officer was pursuing him.  Defendant further averred that he shot Oliva precisely because he mistakenly thought Oliva 
was
 a plain clothes police officer, and that he was reaching for a gun.  Finally, logic would dictate that as a former security guard, Ruiz would have known that police would respond quickly to a bank robbery.  As in 
Pasch
, the evidence is sufficient to show that the defendant knew or should have known that Anhalt was a police officer.

Defendant relies on 
People v. Infelise
, 32 Ill. App. 3d 224,  336 N.E.2d 559 (1975); however, we believe that 
Infelise
 is inapposite.  In 
Infelise
 the defendant was convicted of aggravated assault of a police officer. The incident began when two off-duty police officers, dressed in T-shirts and shorts with handguns in their waistbands, observed several men in a car threaten a young woman.  The officers followed the automobile, and confronted some of the men in front of the defendant's house, identifying themselves as police officers.  The defendant (a 17- year-old immigrant who did not speak English very well) then went into the house, retrieved a gun, pointed it at the officers, and swore at them in Italian.  When the defendant's mother told him (in Italian) that the men were police officers, he put the gun away and cooperated with the officers.  The appellate court held that the State did not prove that the defendant knowingly assaulted a police officer.

Unlike the facts in 
Infelese
, in the case at bar there were a number of indications that Ruiz knew or should have known that Anhalt was a police officer, as we discussed above.  Furthermore, the state of mind necessary for "conviction of aggravated assault is that of knowledge."  The state of mind necessary in the case at bar is a lower standard, namely that the defendant "knew 
or should have known
" (720 ILCS 5/9-1(b)(1) (emphasis supplied)) that Anhalt was a police officer.  Thus 
Infelese
 is inapposite, and the conviction is affirmed. 

The defendant next
(footnote: 3) contends that Public Act 88-680 which, among other things, increased the enhanced penalty for attempted murder of a police officer from not less than 15 and not more than 60 years to not less than 20 and not more than 80 years, is unconstitutional because it violates the single subject rule of the Illinois Constitution.  Therefore, the defendant contends that the new sentencing range is void and he must be re-sentenced under the old standard.  The state responds that Public Act 88-

680 does not violate the single subject rule, and that the defendant's sentence should stand.  We agree with defendant.

Since this appeal was filed, the Illinois Supreme Court decided the case of 
People v. Araceli Cervantes
, No. 87229 (Ill. December 2, 1999) 
in which it held that Public Act 88-680 violates the single subject rule of the Illinois Constitution.  "The effect of enacting an unconstitutional amendment to a statute is to leave the law in force as it was before the adoption of the amendment."  
People v. Gersch
, 135 Ill. 2d 384, 390, 553 N.E.2d 281, 283 (1990).  The "record must establish the sentence is based upon a proper understanding of applicable law."  
People v. Hausman
, 287 Ill. App. 3d 1069, 1072, 679 N.E.2d 867, 869 (1997) (reversing for re-sentencing where the judge sentenced defendant to the "minimum sentence of three (3) years" but the actual minimum sentence for the defendant's offense was two years).  Because the judge in this case incorrectly believed that the proper sentencing range was 20 to 80 years when he sentenced the defendant to 55 years on each count of attempted murder of a peace officer, both sentences must be reversed and remanded for re-sentencing.

Defendant further claims that his sentences of 30 years for both counts of attempted murder of a civilian are excessive.
(footnote: 4)  He argues in support that insufficient weight was given to factors in mitigation, including that he has no prior convictions, a wife, two children and a G.E.D.; that he should be credited for taking the stand and admitting the planning and execution of the armed robbery; and that the sentence is excessive in light of another case which shows similar conduct.  He further states that the sentences imposed make it impossible for him to ever return to useful citizenship.  The State claims that defendant waived appellate review of this issue, and even if such review was not waived, the sentence imposed was proper.  For the reasons stated below, we agree with the State.

Section 5/5-8-1(c) of the Unified Code of Corrections states in part that a "defendant's challenge to the correctness of a sentence or to any aspect of the sentencing hearing shall be made by a written motion."  730 ILCS 5/5-8-1(c) (West 1994).  The Supreme Court held in 
People v. Reed
 177 Ill. 2d 389, 394, 686 N.E.2d 584, 586 (1997), that a written post-trial motion is necessary to preserve sentencing errors for review.  This court may notice errors pursuant to the plain error rule if the evidence is closely balanced or if the error is fundamental.  
People v. Martin
, 119 Ill. 2d 453, 458, 519 N.E.2d 884, 886 (1988); 
People v. Harris
, 204 Ill. App. 3d 491, 496, 496, 561 N.E.2d 1361, 1364 (1990).  In this case, the defendant failed to make a written motion challenging his sentence in the trial court.  Furthermore, the plain error rule does not apply in this case because the evidence was not closely balanced, and no error deprived the defendant of his constitutional right to a fair sentencing hearing.
(footnote: 5)  Therefore, we conclude that defendant waived this issue.

Even if the defendant did not waive this issue, we agree with the State that the trial court properly exercised its discretion when it sentenced the defendant.  The range of sentence for attempted murder of a civilian is 6 to 30 years.  730 ILCS 5/5-8-1(a)(3) (West 1995).  "A sentence which has the greatest potential of restoring the offender to a useful and productive place in society while at the same time adequately punishing the offender for his misconduct and safeguarding the public from further offenses is the one that should be imposed."  
People v. Mick
, 86 Ill. App. 3d 1022, 408 N.E.2d 1079, 1086 (1980).  A defendant's prior criminal record (or lack thereof) is one factor to be considered.  
People v. Hastings
, 72 Ill. App. 3d 816, 825, 390 N.E.2d 1273, 1280 (1979).  However, "the seriousness of the crime has been called the most important factor to be considered in imposing sentence."  
People v. Hernandez
, 204 Ill. App. 3d 732, 740, 562 N.E.2d 219, 225 (1990).  
"As long as the court does not consider incompetent evidence, improper aggravating factors, or ignore pertinent mitigating factors, it has wide latitude in sentencing a defendant to any term within the statutory range prescribed for the offense."  
Hernandez
, 204 Ill. App. 3d at 740. 
 

In this case, the court did not abuse its discretion in sentencing the defendant to two 30-year terms for the attempted murders of Oliva and Anhalt.  The court gave sufficient consideration to mitigating factors at the sentencing hearing.  The judge stated that it was established as a mitigating factor that the defendant had no previous convictions.  The court also stated that it was aware that the defendant had a wife and children, and that his imprisonment would cause hardship to his dependants.  The court also found that the conduct of the defendant caused serious harm because of the shooting of Officer Anhalt, which barely missed his vital organs.  The court stated that the sentence was necessary to deter others from committing the same crimes, and that the court was not satisfied that the circumstances of the crime were not likely to recur, given the planning, the use of a bulletproof vest, and the defendant's actions in trying to escape.  Additionally, although the getaway car was not driven by defendant, the defendant's escape attempt caused a car crash which seriously injured Oliva.

The defendant cites two cases for the proposition that lack of a significant criminal background is a weighty mitigating factor.  We believe that both cases are distinguishable.  In 
People v. Bigham
, 226 Ill. App. 3d 1041, 1049, 590 N.E.2d 115, 121, the court stated that it recognized that "the court is not required to give rehabilitative potential more weight than the seriousness of an offense."  In 
People v. Hastings
, 72 Ill. App. 3d 816, 390 N.E.2d 1273 (1979), the defendant was not convicted of attempted murder, but of deviate sexual assault.  The court reduced his sentence because of his youth, his record of only one misdemeanor conviction, and his successful completion of trade school.  In this case, the defendant was fleeing the scene of a bank robbery with police in pursuit.  He shot at Oliva, an innocent bystander, and attempted to kill him because he thought he was a "cop."  Given the seriousness of the offense in this case (as discussed above), 
Hastings
 is inapposite.

Defendant cites 
People v. Foster
, 199 Ill. App. 3d 372, 556 N.E.2d 1289, 1303 (1990), and 
People v. McClendon
, 146 Ill. App. 3d 1004, 497 N.E.2d 849, 855 (1986), for the proposition that the defendant should be credited for taking the witness stand and admitting his role in the armed robbery.  Both of these cases are inapposite, as both indicate that it is proper for a court to grant leniency to a defendant who 
pleads guilty
, which the defendant in this case did not do.

Defendant further argues that the court should look to other similar cases in determining if the sentence is excessive.  In 
People v. Bien
, 277 Ill. App. 3d 744, 753-4, 661 N.E.2d 511, 518 (1996), the court rejected this approach stating that it is "fundamentally flawed" because it is "statistically invalid" in that it evaluates only a handful of opinions and "fails to consider the vast majority of criminal sentences."  The 
Bien
 court also noted the "supreme court's declaration in similar contexts that comparisons between defendants in different cases are proper, if at all, only when the circumstances of the two defendants are substantially identical."  
Bien
, 277 Ill. App. 3d at 754. 

The defendant cites 
People v. Lewis
, 38 Ill. App. 3d 995, 349 N.E.2d 528 (1976), where the defendant was convicted of an attempted murder for shooting a man in the back as he was lying on the ground after a fight with the defendant.  As a result of the shooting, the victim was paralyzed.  The defendant in 
Lewis
 was only sentenced to 6 to 18 years in prison.  However, the State is able to cite several cases where courts imposed sentences of 30 years for attempted murder.  Given the broad range of variance in the authority cited by both sides, we do not find defendant's argument to be persuasive.  Furthermore, the sentence is within the statutorily prescribed range, and the defendant's crime was very serious (as discussed above).  For the reasons we have explained, the defendant's sentences of 30 years for the attempted murder of Oliva and 30 years for the attempted murder of Anhalt are affirmed.

Finally, defendant argues that the trial court erred in sentencing him to consecutive sentences totaling 105 years in prison.  For an offense to be triggering, it must be a Class X or Class 1 felony and serious bodily harm must be proximate to the offense.  Since no severe bodily injury resulted from the armed robbery or the attempted murder of Whitmore, neither can be a triggering offense for the purpose of consecutive sentences.  Only the attempted murder of Anhalt as a citizen qualifies as a triggering offense.  Also, defendant argues that sentences for all non-triggering offenses must be served concurrently.  The State disagrees, arguing that the defendant waived this argument, and that the trial court properly imposed the sentences.  We agree with the defendant. 

As we discussed above, Section 5/5-8-1(c) of the Unified Code of Corrections requires the filing of a post-sentencing motion to preserve sentencing issues for review; however, this requirement remains subject to the plain error doctrine which allows the court to review sentencing errors which affect substantial rights.  "The right to be lawfully sentenced is a substantial right.  [citation]  Thus, impermissible or illegal sentences may be attacked on appeal as plainly erroneous" even in the absence of a post-sentencing motion.  
People v. Whitney
, 297 Ill. App. 3d 965, 967, 697 N.E.2d 815, 817 (1998) (
Whitney I
).  Since the defendant alleges that his sentence violates the law, including recently expounded supreme court doctrine, we will look to see if the trial court committed plain error in this case.

Since this appeal was filed, the Supreme Court decided 
People v. Whitney
, 188 Ill. 2d 91 (1999) (
Whitney II
).  In 
Whitney II
 the court stated that consecutive sentences are required "where the defendant has been convicted of either a Class X or Class 1 felony 
and
 where he had inflicted severe bodily injury during the commission of that felony."  (emphasis supplied).  In this case the armed robbery of the bank did not result in any bodily injury, and therefore it cannot be a triggering offense for the purposes of consecutive sentences.  The trial court ruled at the sentencing hearing that no injury resulted from the attempted murder of Oliva, and that the attempted murder of Anhalt as a police officer occurred after Anhalt had already been injured (and announced his office), and thus did not result in any injury.  Neither of these points is contested on appeal. Therefore, neither of these offenses can be triggering offenses.  The trial court found that the attempted murder of Anhalt as a civilian resulted in severe bodily injury and, therefore, it is a triggering offense.  Defendant does not contest this point.

Defendant claims that the court erred in finding that the injury to Officer Whitmore's knee was a severe bodily injury.  We agree.  In 
People v. Mays
, 91 Ill. 2d 251, 256, 437 N.E.2d 633, 635-6 (1982), the court stated that while determining what constitutes "bodily harm" in the context of simple battery may be difficult, "some sort of physical pain or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent, is required."  "Because great bodily harm requires an injury of a graver and more serious character than an ordinary battery, simple logic dictates that the injury must be more severe than that set out in the 
Mays
 definition."  
People v. Figures
, 216 Ill. App. 3d 398, 401, 576 N.E.2d 1089, 1092 (1991) (construing "great bodily harm" in the context of the aggravated battery statute).

We believe that 
People v. Durham
, 303 Ill. App. 3d 763, 708 N.E.2d 1249 (1999), is on point.  In 
Durham
, the defendant was convicted of aggravated battery with a firearm.  The victim of the battery sustained a gunshot injury which required no medical attention and was described "as a mark or something 'of that nature' and 'like a small nick or cut.'" 
Durham
, 303 Ill. App. 3d at 770.  On appeal, the court held that the sentencing court had abused its discretion in finding that the wound was a severe bodily injury for sentencing purposes.
(footnote: 6)  In this case, the wound sustained by Officer Whitmore was barely visible in a photograph of his knee which was taken on the day of the incident.  He testified that at one point during the shooting he felt a sharp pain in his knee, and that he later determined that he was hit by a bullet.  Officer Whitmore did not immediately seek medical treatment, but went to a police roundtable meeting first.  Like the wound in 
Durham
, the gunshot wound to Officer Whitmore's knee was not a severe bodily injury for sentencing purposes.

Defendant contends that the trial court erred in its determination of consecutive sentences because the attempted murder of Anhalt as a civilian is the only triggering offense, and therefore the sentences for all other offenses must be served concurrently.  We agree with the defendant's contention.

"The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury."  730 ILCS 5/5-8-

4(a).  The "trial court must impose concurrent sentences, unless a statutory exception requires consecutive sentences."  
People v. Medrano
, 282 Ill. App. 3d 887, 669 N.E.2d 114 (1996).  "[C]onsecutive sentences are mandatory only for those offenses which trigger the application of section 5-8-4(a)."  
People v. Curry
, 178 Ill. 2d 509, 539, 687 N.E.2d 877, 891 (1997).  "Sentences for multiple non-triggering offenses may be served concurrently to one another after any consecutive sentences for triggering offenses have been discharged."  
Curry
 178 Ill. 2d at 539. 

In this case, only one of the offenses of which the defendant was convicted can be a triggering offense, and that is the attempted murder of Anhalt as a civilian.  Therefore, that offense must be served consecutively to all of the other offenses.  Once the sentence for this triggering offense has been discharged, then the sentences for the other offenses must be served concurrently to each other.  Therefore the trial court's determination of which sentences are to be served consecutively, and which are to be served concurrently, is reversed.

For the forgoing reasons, the judgement of the Circuit Court of Cook County is affirmed in part, reversed in part, and remanded for further proceedings not inconsistent with this opinion.

Affirmed in part, reversed in part; cause remanded. 

COUSINS, P.J. and McNULTY, J., concur.

FOOTNOTES
1:
The defendant was also convicted of several lesser charges (namely two  counts each of aggravated discharge of a firearm at a peace officer, aggravated discharge of a firearm at a civilian, and aggravated battery with a firearm) which were vacated by the trial court.

2:
Section 5/8-1 provides for sentencing enhancement if there is an attempt to commit murder and an aggravating factor (such as the defendant knew or should have known the victim was a police officer performing his official duties) is present.

3:
This argument was actually submitted in a supplemental brief, but we discuss it at this stage for the sake of logic and brevity.

4:
The defendant also argues that the sentences of 55 years for the attempted murder of a police officer were excessive.  We need not address this argument as those sentences have already been reversed and remanded for re-sentencing due to the unconstitutionality of Public Act 88-680.

5:
Details of the sentencing hearing are discussed below.

6:
The 
Durham
 court also rejected the State's argument that 
People v. Johnson
, 149 Ill. 2d 118, 594 N.E.2d 253 (1992) stands for the proposition that a gunshot wound satisfies the bodily harm requirement.  The court reasoned that since the victim in 
Johnson
 was hospitalized for at least one day due to the gunshot, 
Johnson
 was inapposite.  The State makes a similar claim in this case based on 
People v. Biggs
, 294 Ill. App. 3d 1046, 691 N.E.2d 48 (1998) (victim was shot in the chest and hospitalized).  We adopt the reasoning of the 
Durham
 court with respect to 
Johnson
, and find for the same reason that 
Biggs
 is inapposite.